**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT PIERCE DIVISION**

**CASE NO. 22-14429-CIV-CANNON/McCabe**

**KALIL DESIGN CONCEPTS, LLC,**

      Plaintiff,

v.

**THOMAS E. POWNALL** and
**PRESTIGE COMPOSITES, LLC**,

      Defendants.

_____/

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

**THIS CAUSE** comes before the Court upon Defendants' Motion for Partial Summary Judgment ("Defendants' Motion") [ECF No. 82], and Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") [ECF No. 102]. The Court has reviewed the motions, the responses in opposition [ECF Nos. 96, 112], the replies in support [ECF Nos. 117, 120], the various statements of facts [ECF Nos. 81, 88, 97, 101, 105, 113, 118], and the full record. The Court also heard argument on the motions on July 10, 2024 [ECF Nos. 127, 134 (transcript)], after which the parties filed competing notices of supplemental authority [ECF Nos. 129, 130]. For the reasons set forth herein, Plaintiff's Motion [ECF No. 102] is **DENIED**, and Defendants' Motion [ECF No. 82] is **GRANTED**.

**FACTUAL BACKGROUND**[1]

This case arises from a contract for the manufacture of boats using two propriety boat mold and plug designs: Barracuda molds and Rhino molds. Plaintiff, Kalil Design Concepts, LLC, is a Florida limited liability company that provides design and engineering services [ECF No. 88 ¶ 13;

---

[1] These facts are undisputed unless otherwise noted and derive primarily from the parties' Joint Statements of Undisputed Facts and supporting exhibits [ECF Nos. 88, 105].

ECF No. 105 ¶ 1; ECF No. 81 ¶ 18; ECF No. 97 ¶ 18]. Anthony Kalil ("Kalil") and his wife are Plaintiff's sole members [ECF No. 88 ¶¶ 12–13; ECF No. 105 ¶ 1]. Defendant Prestige Composite, LLC ("Prestige") is a boat manufacturer based in South Carolina [ECF No. 88 ¶ 17; ECF No. 105 ¶ 6]. Defendant Thomas E. Pownall ("Pownall") is a member of Prestige [ECF No. 81 ¶ 24].

Plaintiff sued Defendants in 2022 for breach of the parties' Licensing Agreement and for the unlawful retention of Plaintiff's Barracuda and Rhino molds [ECF No. 1 (Complaint)]. The factual background of this case dates back years and involves other lawsuits, relationships with non-parties, and an ancillary contract not referred to in the Complaint. The Court begins with the origin of the first type of proprietary boat molds implicated in this suit, the Barracuda molds, and then summarizes the background relevant to the Rhino molds.

A.     The Barracuda Molds

Kalil designed the Barracuda molds while working for an unnamed entity years before the events giving rise to the present dispute [ECF No. 88 ¶ 1]. Sometime thereafter, a company known as Barracuda Boats, LLC began manufacturing boats using the Barracuda molds [ECF No. 88 ¶ 2]. Barracuda Boats, LLC would eventually cease production of boats in 2015 [ECF No. 88 ¶ 3]. Barracuda Boats, LLC later outsourced production of boats using the Barracuda molds to a company known as Falcon Marine in 2016 [ECF No. 88 ¶¶ 5–6]. Falcon Marine produced boats until 2017 [ECF No. 88 ¶ 7].

Barracuda Boats, LLC brought a lawsuit against Falcon Marine in 2018 stemming from a boat-design-and-manufacturing contract similar to the agreement at issue here [ECF No. 88-2]. During the pendency of that lawsuit, the Barracuda molds remained in Falcon Marine's possession, stored outdoors "sitting in the sun" [ECF No. 88 ¶ 10]. Once Barracuda Boats, LLC obtained possession of the Barracuda molds at the conclusion of that lawsuit, the molds were placed in a storage facility in Palm City, Florida, where they remained until Defendants in this action took

2

possession of them in December 2020 [ECF No. 88 ¶ 11].  Plaintiff, Kalil Design Concepts, LLC, was formed in the interim during April 2020 [ECF No. 88 ¶ 12].

### B.     The Licensing Agreement

On or about December 10, 2020, Plaintiff and Pownall discussed an arrangement for the manufacture of boats using the Barracuda molds [ECF No. 105 ¶ 3].   After their conversation, Pownall sent the following text message to Kalil: "[t]hanks for the opportunity I know we will be successful" [ECF No. 105-5].  On December 29, 2020, Pownall inspected the Barracuda molds at Plaintiff's storage facility in Florida [ECF No. 105 ¶ 4].  That same day, Kalil, in his capacity as Plaintiff's representative, and Pownall, in both his individual capacity and as representative of Prestige, executed the Licensing Agreement [ECF No. 1 p. 22 (Kalil's signature dated "12/29/2020"); ECF No. 1 pp. 22–23 (Pownall's signatures not dated)].[2]  The purpose of the Licensing Agreement was to make the Licensor's "patent rights and know-how available" to the Licensee "for the development and commercialization of boats" [ECF No. 1 p. 10 (Licensing Agreement)].  The Licensor in the Agreement is the Plaintiff in this case (Kalil Design Concepts, LLC); the Licensee in the Agreement is Prestige, although Prestige and Pownall are both parties to the Agreement [ECF No. 1 pp. 9–24; ECF No. 81 ¶ 24].   Section 2.3 of the Licensing Agreement provides as follows:

> 2.3 <u>Retained Rights</u>. Licensee hereby acknowledges that ownership of all Plugs and Molds for producing Products (including all Barracuda Plugs and Molds, as well as other Plugs and Molds owned by Licensor or Licensor's affiliate) and any preparatory or finishing treatments, or other modifications made by Licensee, or

---

[2] Defendants claim they never signed the Licensing Agreement [ECF Nos. 82, 112; ECF No. 70 (Forgery Counterclaim)].  While Defendants dispute the authenticity and legal effect of the Licensing Agreement, Defendants do not dispute that such a document exists or that Pownall was aware of such a document [ECF No. 81 ¶ 24 ("Although the parties dispute the details, both parties agree that in late December 2020 [Plaintiff and Defendants] . . . entered into a license agreement . . . .")].  Further discussion about the Licensing Agreement is contained within the Discussion of this Order.

such Plugs and Molds, and any intellectual property based on such Plugs or Molds
(as existing or as modified by Licensee) resides with the Licensor.

[ECF No. 1 p. 12].  Following the execution of the Licensing Agreement, Pownall transported the

Barracuda molds from Florida to Defendants' facility in South Carolina [ECF No. 105 ¶ 6].

### C.      The Rhino molds

After formation of the arrangement between Plaintiff and Defendants to produce boats

using the Barracuda molds, Plaintiff acquired the Rhino molds from a non-party individual named

Ronnie White ("White") [ECF No. 105 ¶ 7; ECF No. 88 ¶ 17].  Kalil and White began discussing

the purchase of White's Rhino molds sometime in early May 2021 [ECF No. 88 ¶ 16].  On May

23, 2021, Plaintiff and White executed a contract (the "Purchase Agreement") governing the sale

of the Rhino molds [ECF No. 88 ¶ 18; ECF No. 105-4 (Purchase Agreement)].  Under the Purchase

Agreement, White assigned to Plaintiff, for two years, his rights in the Rhino mold intellectual

property, in exchange for Plaintiff being required to pay White $40,000 within two years of

execution of the contract (*i.e.*, by May 23, 2023) [ECF No. 88 ¶ 19; ECF No. 105-4].  Most notably,

Plaintiff agreed to assign the rights and ownership to the Rhino molds back to White if, by the end

of the two-year payment period, Plaintiff did not pay White $40,000 [ECF No. 105-4 p. 5].

Pownall eventually picked the Rhino molds up in Baxley, Georgia, and transported them

to Defendants' facility in South Carolina [ECF No. 88 ¶ 17].  At some point following Plaintiff's

purchase of the Rhino molds, Pownall approached White about buying out his interest in the

Purchase Agreement [ECF No. 81-9 p. 8 (Deposition of Ronnie White)].  White ultimately

assigned his rights under the Purchase Agreement to Pownall in exchange for $40,000, including

the right to receive payment for the Rhino molds from Plaintiff [ECF No. 81-10 (Bill of Sale and

Assignment)].  That crucial assignment occurred on June 25, 2022, well before Plaintiff's payment

under the Purchase Agreement came due [ECF No. 81-10].  Plaintiff does not dispute that White

assigned the Purchase Agreement and does not challenge the validity of such assignment [*see* ECF Nos. 96, 102, 120; ECF No. 134 pp. 61–62].

    **D.**    **Alleged Breach**

    For various disputed reasons not dispositive to resolution of the present motions, the relationship between Plaintiff and Defendants soured [ECF No. 81 ¶ 40].  On June 17, 2022— eight days prior to the White-Pownall assignment of rights under the Purchase Agreement— Plaintiff sent a demand letter to Pownall demanding the immediate return of all boat molds currently in Defendants' possession [ECF No. 105-6].  Pownall responded to the demand letter stating that there was no enforceable contract [ECF No. 105-7].  Defendants then refused to turn over the Barracuda and Rhino molds, which remain in the possession of Defendants [ECF No. 105-7; *see* ECF No. 134 p. 11].  This litigation ensued on December 28, 2022 [ECF No. 1]

    On May 23, 2023, after Plaintiff commenced this proceeding, Plaintiff moved to deposit in the Court's registry the $40,000 owed to White under the Purchase Agreement [ECF No. 46].  Neither party disputes that Plaintiff has not paid White or Pownall the $40,000 due to be paid under the Purchase Agreement [ECF No. 134 p. 54 (Court: "Okay the $40,000 was never paid to Mr. White; correct" Plaintiff: "Correct"); ECF No. 105-4 (setting payment date of May 23, 2023)].

**PROCEDURAL BACKGROUND**

    Plaintiff's three-count Complaint asserts the following claims against Defendants: (1) breach of contract stemming from the Licensing Agreement ("Count I"); (2) conversion arising from Defendants' refusal to return the Barracuda and Rhino boat molds ("Count II"); and (3) declaratory relief seeking a declaration that the Licensing Agreement is valid and enforceable ("Count III") [ECF No. 1].  In addition to declaratory relief, Plaintiff seeks damages for Defendants' alleged breach pursuant to the liquidated damages provision in the Licensing Agreement [ECF No. 1].  As referenced, on May 23, 2023, Plaintiff moved to deposit $40,000 into

5

the Court registry [ECF No. 46].  The Court granted Plaintiff's motion to deposit funds on June 21, 2023, and, in doing so, expressly declined to address or comment on the merits of the underlying dispute in this case [ECF No. 52].  Plaintiff deposited the funds into the Court registry later that month on June 29, 2023 [ECF No. 55].

On September 13, 2023, Defendants filed their Amended Answer and Counterclaims [ECF No. 70].[3]  Defendants lodge eight causes of action in their Amended Counterclaims, including: (1) breach of contract (implied in fact); (2) unjust enrichment; (3) declaratory relief seeking a declaration that the Licensing Agreement is invalid and unenforceable; (4) forgery (related to Pownall's signature on the Licensing Agreement); (5) violation of the Florida Deceptive and Unfair Trade Practices Act; (6) declaratory judgment seeking a declaration that Pownall, not Plaintiff, is the owner of the Rhino molds; (7) aiding and abetting breach of fiduciary duty; and (8) tortious interference with contract [ECF No. 70].[4]  On January 5, 2024, following Court-ordered mediation, the parties notified the Court that settlement negotiations had broken down and ended in an impasse [ECF No. 78].

The parties timely filed their respective motions for summary judgment [ECF Nos. 82, 83, 102].  The Court heard argument on the motions on July 10, 2024, and later received notices of supplemental authorities [ECF Nos. 128, 129, 130, 134].  The motions are ripe for adjudication.

## LEGAL STANDARD

---

[3] Defendants sought leave to amend to add counterclaims related to the Rhino molds, arguing that recent discovery responses by Plaintiff indicated that the molds at issue, though not expressly mentioned in Plaintiff's Complaint [ECF No. 1], included the Rhino molds [ECF No. 56].  The Court granted Defendants leave to amend [ECF Nos. 67, 59].

[4] Counts VII and VIII of Defendants' counterclaims are expressly pled in the alternative of Count VI [ECF No. 70].

Summary judgment is appropriate where there is "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed R. Civ. P. 56(a). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At summary judgment, the moving party has the burden to prove the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. *Anderson*, 477 U.S. at 252. "For factual issues to be considered genuine, they must have a real basis in the record." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (internal quotation marks omitted). Speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In assessing whether the moving party has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001). Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with evidence showing a genuine issue of material fact that precludes summary judgment. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); Fed. R. Civ. P. 56(e), (c). In that instance, a non-moving party's failure to produce evidence for an essential element of a claim warrants summary judgment in favor of the moving party. *Celotex Corp.*, 477 U.S. at 323.

**DISCUSSION**

Each of the cross-motions urges the total dismissal of the opposing parties' (or party's) claims. The threshold question in resolving the motions is whether Plaintiff is the legal owner of the Barracuda and Rhino molds. Defendants argue that Plaintiff does not own either category of molds, while Plaintiff argues that it should be declared the legal owner. The Court unpacks the overlapping facts and arguments with respect to ownership below, followed by legal analysis. Ultimately, upon careful review, and under the plain terms of the contracts at issue, the Court concurs with Defendants that there is no genuine issue of material fact that Plaintiff does not own either the Barracuda or Rhino molds. That legal determination results in the grant of summary judgment in favor of Defendants on all of Plaintiff's claims. In light of remaining factual disputes, on Defendants' counterclaims, however, Counts I, II, IV, and V of Defendants' Counterclaims will nonetheless proceed to trial. The Court reasons below.

I.   **There is no triable question that Plaintiff does not own the Barracuda molds.**

Defendants' argument as to the Barracuda molds is based on the legal distinction between Plaintiff Kalil Design Concepts, LLC, a limited liability company, and Kalil, an individual and Plaintiff's principal. While the copyrights and patents for the Barracuda molds are in Kalil's name, Kalil is, without dispute, not a party to the Licensing Agreement [ECF No. 1 pp. 9–24]. Plaintiff is a party to the Licensing Agreement, but, critically, there is no record evidence of a written assignment of the rights to the Barracuda molds from Kalil to Plaintiff [ECF No. 88 ¶ 14; ECF No. 118 ¶ 3]. Without any such written assignment, Defendants argue that (i) Plaintiff lacks corporate standing to bring this action because it suffered no injury, and (ii) the Licensing Agreement lacks consideration and therefore is unenforceable.

Plaintiff responds that a written assignment of Kalil's rights in the Barracuda molds to Plaintiff was not a necessary precondition to Plaintiff's ability to license the molds to Defendants.

Plaintiff also argues in the alternative that, if an assignment was necessary, the Licensing Agreement itself functions as a valid, written assignment of the Barracuda molds from Kalil to Plaintiff [ECF No. 96 pp. 3–4].

    **A.    Analysis: Barracuda molds**

Resolving the issue of ownership with respect to the Barracuda molds raises two questions. First, was a written assignment of the rights to the Barracuda molds from Kalil to Plaintiff necessary before Plaintiff could license the molds to Defendants?  Second, if a written assignment was necessary, does the Licensing Agreement function as a valid written assignment?  Based on the undisputed record, the Court answers the first question in the affirmative and the latter question in the negative.

    **i.    Kalil's intellectual-property rights in the Barracuda molds could only be assigned in writing**.

An "assignment transfers to the assignee all the interests and rights of the assignor in and to the thing assigned."  *State v. Family Bank of Hallandale*, 667 So. 2d 257, 259 (Fla. Dist. Ct. App. 1995); *Assignment*, Black's Law Dictionary (7th ed 2000) (defining "assignment" as "the transfer of rights or property").  It is well established as a matter of federal statutory law and supporting caselaw that assignments of intellectual property must be in writing.  *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 240 F.3d 1016, 1017 (Fed. Cir. 2001) ("The party asserting that it has all substantial rights in the patent must produce written instruments documenting the transfer of proprietary rights." (alterations omitted)); *see also Abraxis Bioscience, Inc. v. Navinta*, 625 F.3d 1359, 1366 (Fed. Cir. 2010) (noting that a transfer of ownership between a parent and subsidiary does not obviate the writing requirement for assignments of intellectual property); *Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc.*, 70 F.3d 96, 99 (11th Cir. 1995) ("[T]he chief purpose of the [writing requirement] is to . . . protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership."); 35 U.S.C. § 261 ("Applications

9

for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing."); 17 U.S.C. § 204(a) ("A transfer of copyright ownership, other than by operation of law, is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed.").

The intellectual property related to the Barracuda molds consists of U.S. patents and copyrights in Anthony Kalil's name [ECF No. 81-5 (U.S. Patent dated 2006); ECF No. 81-6 (U.S. Patent dated 2016); ECF No. 81-7 (U.S. Copyright Office Form D-VH); *see* ECF No. 1 pp. 10, 24 (licensed patents)]. None of that property is registered in Plaintiff's name, and there is no record evidence of a written transfer of property from Kalil to Plaintiff (more on the Licensing Agreement below). Although Plaintiff asserts that Kalil was permitted to transfer his ownership rights to Plaintiff without a written instrument, Plaintiff offers no authority to support the absence of a writing requirement in this context, while Defendants have supplied ample authority affirming the writing requirement for transfers of intellectual property [ECF No. 83 pp. 6–7; ECF No. 129 p. 2].[5] Further, as mentioned above, there is no record evidence of a written transfer [ECF No. 88 ¶ 14;

---

[5] In its Notice of Supplemental Authority, Plaintiff cites cases purportedly supporting its view that a written instrument is not required to assign interests in federal patents and copyrights [ECF No. 130]. None of those authorities displaces or undermines the statutory rule that assignments of federal patents and copyrights must be done via a written instrument. *E.g.*, 35 U.S.C. § 261; 17 U.S.C. § 204(a). In *Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354 (Fed. Cir. 2008), for example, the Federal Circuit confronted a question about whether ownership of a U.S. patent transferred from a Japanese father, under Japanese law, to his heirs when he died without a will, where the father's heirs later executed written assignments transferring the patent to the litigating plaintiff. Nothing in that decision about foreign intestacy law undermines the requirement of a written assignment in this case, which of course does not involve intestacy law, state or otherwise. Plaintiff's other cases are also distinguishable. *Brodie v. All Corp. of USA*, 876 So. 2d 577 (Fla. Dist. Ct. App. 2004), involved an employment contract, without any connection to intellectual property or assignments thereof. *Id.* at 579. And *McElroy v. Courtney Ajinca Events LLC*, 512 F. Supp. 3d 1328 (N.D. Ga. 2021), citing 17 U.S.C. § 101, concerns the unrelated principle that a non-exclusive license in copyrights need not be in writing, *id.* at 1336—not an assignment of ownership in federal patents or copyrights. There is no suggestion or evidence that the purported transfer of rights from Kalil to Plaintiff was a non-exclusive license of intellectual property, and indeed Kalil maintains the existence of an assignment [*see* ECF No. 118 ¶ 3].

ECF No. 118 ¶ 3]. For purposes of determining the legal owner of the Barracuda molds, the Court therefore proceeds on the understanding that Kalil could not transfer his rights in the Barracuda molds to Plaintiff absent a written instrument.

> ### ii.    The Licensing Agreement does not serve as written assignment of the Barracuda molds as a matter of law.

Having determined that binding law requires assignments of intellectual property to be in writing, the Court addresses Plaintiff's alternative argument that the Licensing Agreement itself amounts to the written assignment [*see* ECF No. 134 pp. 38–43]. In support of this view, Plaintiff points to various provisions in the Licensing Agreement which it claims evidence the parties' intent to make the Licensing Agreement serve as a written assignment of the Barracuda molds from Kalil to Plaintiff [ECF No. 134 pp. 38–43].[6]

In interpreting an assignment, as with any other contract, the Court "read[s] the words of a contract in the context of the entire contract and constru[es] the contract to effectuate the parties' intent." *Feaz v. Wells Fargo Bank, N.A.*, 745 F.3d 1098, 1104 (11th Cir. 2014). "That intent is derived from the objective meaning of the words used," and "[e]xtrinsic evidence of the parties' subjective understanding is not consulted unless the contract is ambiguous," *id.*; *see also BioHealth Med. Lab'y, Inc. v. Cigna Health & Like Ins. Co.*, 706 F. App'x 521, 524 (11th Cir. 2017); *Hatadis v. Achieva Credit Union*, 159 So. 3d 256, 259 (Fla. Dist. Ct. App. 2015). An "assignment transfers to the assignee all the interests and rights of the assignor in and to the thing assigned." *Hallandale*, 667 So. 2d at 259. Thus, "[a] court will find an assignment when there is an intent to assign a present right in property, divesting the assignor of all control over the property." *Physicians Care Ctrs. of Fla., LLC v. PNC Bank, N.A.*, 345 So. 3d 907, 912 (Fla. Dist. App. Ct. 2022) (internal

---

[6] This argument was not well developed in the summary judgment briefing and was not pursed in earnest until the July 10, 2024, hearing.

quotation marks omitted). There are no "magic words" that must be included in a document to satisfy the writing requirement for assignments of intellectual property. *Cf. Vergara Hermosilla v. Coca-Cola Co.*, No. 10-21418-CIV, 2011 WL 744098, at *3 (S.D. Fla. Feb. 23, 2011) (applying Florida statutory copyright law), *aff'd sub nom. Hermosilla v. Coca-Cola Co.*, 446 F. App'x 201 (11th Cir. 2011)); *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990) ("The rule is really quite simple: If the copyright holder agrees to transfer ownership to another party, that party must get the copyright holder to sign a piece of paper saying so. It doesn't have to be the Magna Charta; a one-line pro forma statement will do."). Once there is an assignment, "[t]he assignee stands in the shoes of the assignor and is able to maintain suit in its own name as a real party in interest." *United Water Restor. Grp. Inc. v. State Farm Fla. Ins. Co.*, 173 So. 3d 1025, 1027 (Fla. Dist. Ct. App. 2015).

Plaintiff contends that "the Licensing Agreement itself, consistent with Kalil's sworn testimony, can be read to satisfy the writing requirement" [ECF No. 134 p. 42 (cleaned up)]. In Plaintiff's view, the Licensing Agreement assumes or acknowledges Plaintiff's ownership of the Barracuda molds and therefore an initial conveyance from Kalil can be inferred from the Licensing Agreement [ECF No. 134 pp. 38–43]. The relevant provisions in the Licensing Agreement on which Plaintiff relies are as follows:

- Article II Section 3: "Retained Rights. Licensee hereby acknowledges that ownership of all Plugs and Molds for producing Products (including all Barracuda Plugs and Molds, as well as other Plugs and Molds owned by Licensor or Licensor's affiliates) . . . resides with Licensor" [ECF No. 1 p. 12].

- Article II Section 7: "The parties expressly agree that the Molds are the exclusive property of Licensor and are subject to being returned to Licensor at any time, on no more than 7 days' notice" [ECF No. 1 p. 13].

- Article X Section 1: "Warranty to Title. Licensor represents and warrants that Licensor will take all steps necessary to grant or cause to be granted to Licensee the Licensed Technology and has the legal power and authority to extend the rights granted to Licensee pursuant to this Agreement . . . ." [ECF No. 1 p. 19].

As a reminder, "Licensor" under the Licensing Agreement refers to Plaintiff, and "Licensee" refers to Prestige [ECF No. 1 p. 10].

Following the plain terms of the Licensing Agreement, the Court determines that it does not operate as a written assignment of the Barracuda molds from non-party Kalil to Plaintiff.  Most fundamentally, there is no language in these provisions, or anywhere else in the Licensing Agreement, manifesting the contracting parties' intent that Kalil would divest his interest in the Barracuda molds and convey a present interest in them to Plaintiff.  Article II, Section 3, for example, speaks to Defendants' acknowledgment that ownership resides with Plaintiff; Article II, Section 7 says the parties agree the molds are Plaintiff's exclusive property; and Article X, Section 1 has Plaintiff representing that it has the power to extend rights granted in the Agreement [ECF No. 1 pp. 12, 13, 19].  While these provisions, individually or taken together, clearly hold Plaintiff out as the owner of the Barracuda molds, that representation of Plaintiff's ownership simply is not the equivalent of a written assignment actually transferring interests and rights over the property from the undisputed owner of such property—in this case Kalil, a non-party to the Agreement—to Plaintiff.[7]  Nor is the Court free to create an assignment of rights from another party's representation of its authority over such property.  With respect to the term "affiliates" in the Licensing Agreement, a term contained in Article II, Section 3 and relied upon by Plaintiff as evidence of a purported assignment, the Licensing Agreement itself defines that term to include only corporate entities, not individuals like Kalil or anyone else [ECF No. 1 p. 11 (defining "affiliates" as "companies, corporations, partnerships, joint ventures, business trusts or other business entities")].  For these reasons, even under the low bar for satisfying the written-

---

[7] Kalil signed the contract in his capacity as Plaintiff's representative [ECF No. 1 pp. 22–23 (Kalil signing as President of Kalil Design Concepts LLC, alongside signatures for Prestige Composites, Inc. and Thomas Pownall in his individual capacity)].

assignment requirement, the plain terms of the Licensing Agreement simply do not amount to an assignment of rights from non-party Kalil to Plaintiff.[8]

Because the terms of the Licensing Agreement are unambiguous, there is no need to resort to extrinsic evidence.  *See Feaz*, 745 F.3d at 1104; *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1548–59 (11th Cir. 1996).  In any event, even if the Court were to consider Kalil's deposition testimony provided in this litigation, what he says in that deposition essentially returns us back to the terms of the Licensing Agreement.  He testified, for example, that he intended to assign the Barracuda molds to Plaintiff via the Licensing Agreement; that it was his custom to license intellectual property through an entity; and that his lawyers drafted the Licensing Agreement in such a way that no assignment was necessary [ECF No. 96 p. 3; ECF No. 118 ¶ 3].  None of that extrinsic evidence about Kalil's beliefs or his prior business practice can supplant the unambiguous language of the Licensing Agreement, which, for all of the reasons stated, does not contain an assignment of the Barracuda molds' intellectual property from Kalil to Plaintiff.  And again, Kalil is not even a party to the Licensing Agreement.  Plaintiff is a distinct corporate entity whose corporate form cannot be disregarded.

**B.     Conclusion: Barracuda molds**

In sum, there is no evidence in the summary judgment record that Kalil assigned his rights in the Barracuda molds to Plaintiff through the Licensing Agreement or through any other written document.  Absent such evidence, there is no factual dispute that Plaintiff is not the legal owner of the Barracuda molds and therefore cannot stand in the shoes of Kalil as a real party in interest.

---

[8] As an aside, the Court notes some oddity in the underlying premise of Plaintiff's position with regards to the purported assignment.  For Plaintiff to be correct that the Licensing Agreement operates as an assignment of rights from non-party Kalil to Plaintiff, the Licensing Agreement would have to be read as effecting a simultaneous (a) assignment of property from Kalil to Plaintiff and (b) license of rights in the same property from Plaintiff to Prestige.  The terms of the Licensing Agreement do not accord with that premise.

For this reason, Plaintiff lacks standing to sue Defendants for their allegedly unlawful retention of intellectual property Plaintiff does not own.  Although the absence of a written assignment is fatal to Plaintiff's claims as rooted in the Barracuda molds, the Court cannot betray the plain language of the Licensing Agreement to make up assignments or otherwise deviate from the requirement that such assignments be in writing.[9]

The effect of this determination means that Defendants' Motion is **GRANTED** on the issue of ownership of the Barracuda molds, and that Plaintiff's Motion on that same issue is **DENIED**.  More specifically, Plaintiff's claim for breach of contract (Count I) fails as a matter of law; there was no consideration for the Licensing Agreement because Plaintiff purported to transfer something of value that it did not have the authority to transfer.  For that same reason, Plaintiff cannot be said to have suffered any damages from Defendants' failure to return the Barracuda molds.  Count III—Plaintiff's claim for declaratory relief tied to the Licensing Agreement—also fails as a matter of law; Plaintiff is not entitled to a declaration that the molds must be returned given the absence of an assignment and Plaintiff's corresponding lack of ownership [ECF No. 1].  Similarly, Plaintiff's conversion claim in Count II as to the Barracuda molds cannot stand; Plaintiff cannot assert that Defendants' retention of the Barracuda molds is inconsistent with an ownership interest Plaintiff does not have [ECF No. 1].    Finally, turning to Defendants' Amended Counterclaims, Defendants seek a declaration in Count III that the Licensing Agreement is unenforceable for a variety of reasons [ECF No. 70 pp. 14–15].  It is sufficient for the Court to determine with respect to that claim that the Licensing Agreement is invalid as a matter of law for

---

[9] Kalil chose to pursue this action with Kalil Design Concepts, LLC as the sole plaintiff.  It is not clear why Kalil did not join this suit [ECF No. 86 p. 9 n. 3].  Nothing in this Order should be construed as a determination as to Kalil's ownership of the Barracuda molds or as a comment on Kalil's ability to obtain legal relief against Defendants on account of the Barracuda molds.

lack of consideration, as already explained above [*see* ECF No. 83 p. 7 ("The lack of ownership by [Plaintiff] means the Licensing Agreement fails for lack of consideration.")].

## II.   There is no genuine issue of material that Defendants own the Rhino molds.

It remains to be decided whether Plaintiff has any valid claim against Defendants related to the other category of boat molds and plugs at issue in this litigation—that is, the Rhino molds.[10]

Under the Purchase Agreement executed between Plaintiff and White, Plaintiff was required to pay White $40,000 by May 23, 2023, and Plaintiff was required to assign the Rhino molds back to White in the event of nonpayment by that date [ECF No. 105-4 pp. 4, 8].  On June 25, 2022, White assigned his rights as the "Seller" under the Purchase Agreement to Pownall, and that assignment is documented in an uncontested Bill of Sale [ECF No. 81-10].  As the assignee of White, Pownall holds the right to receive payment under the Purchase Agreement and the right to receive the Rhino molds if Plaintiff does not pay the required sum [ECF No. 105-4; ECF No. 81-10].  No party disputes that Plaintiff has not paid White or Pownall the $40,000 due under the Purchase Agreement [ECF No. 134 p. 54].  And Plaintiff has never disputed the enforceability of the Purchase Agreement or White's assignment to Pownall thereof [ECF Nos. 96, 102, 117; ECF No. 134 pp. 61–62].

Defendants argue that they were entitled to receive $40,000 under the Purchase Agreement as assignees of White, and that they are the legal owners of the Rhino molds in light of Plaintiff's failure to pay the $40,000 [ECF No. 83 pp. 9–13].  Unable to offer any record evidence to undermine the validity of the White-Pownall assignment, Plaintiff raises two arguments in response: (i) that Plaintiff's obligation to pay under the Purchase Agreement was excused because of Defendants' material breach of the Licensing Agreement [ECF No. 46; ECF No. 117 pp. 6–7;

---

[10] While not expressly mentioned in the Complaint, the Court construes Count II of Plaintiff's Complaint as maintaining a claim for conversion of the Rhino molds.  *See supra* n.3.

ECF No. 134 pp. 59–60]; and (ii) that when Plaintiff deposited the funds in the Court registry, its contractual obligations under the Purchase Agreement were satisfied pending the outcome of this litigation [ECF No. 96 p. 4; ECF No. 134 pp. 55–60].

The Court disagrees with Plaintiff on both points and determines that Plaintiff's remaining conversion claim tied to the Rhino molds (Count II) fails as a matter of law.

### A.      Analysis: Rhino molds

As a reminder, on May 23, 2023, Plaintiff filed its Motion to Deposit Funds into the Court registry [ECF No. 46].  In doing so, Plaintiff asserted the Court's equitable authority to maintain the status quo and argued that Defendants' breach of the Licensing Agreement excused Plaintiff's performance under the Purchase Agreement [ECF No. 46 pp. 2–3].  Plaintiff broadly characterized White's assignment of his rights in the Purchase Agreement to Pownall as Defendants' "attempt to interfere with and usurp [] Plaintiff's rights as the owner of the Rhino molds," but Plaintiff did not contest the assignment's legality [ECF No. 46 p. 2].  On June 21, 2023, the Court granted Plaintiff's Motion and clarified that it made no determination on the merits of the underlying contractual dispute [ECF No. 52 ("Nothing in this Order should be construed as an indication on the merits of the underlying dispute in this case")].  Plaintiff deposited the $40,000 due under the Purchase Agreement into the Court registry on June 29, 2023 [ECF No. 55].

### i.      Defendants' alleged breach of the Licensing Agreement did not excuse Plaintiff's performance under the Purchase Agreement.

Plaintiff has argued throughout its submissions that its performance under the Purchase Agreement was excused when Defendants breached the Licensing Agreement [ECF No. 46; ECF No. 117 pp. 6–7; ECF No. 134 pp. 59–60].  Although a material breach of one contract excuses the performance of the non-breaching party, *see, e.g.*, *Bradley v. Health Coal, Inc.*, 687 So. 2d 329, 333 (Fla. Dist. App. Ct. 1997), that principle applies within a single contractual relationship rather than across multiple contracts, *Riley Aircraft Mfg., Inc. v. Koppers Co.*, 99 So.

2d 227, 230 (Fla. 1957) ("The breach of one contract does not justify the aggrieved party in refusing to perform another."); *Coplay Cement Co. v. Willis & Paul Grp.*, 983 F.2d 1435, 1439 (7th Cir. 1993) ("[O]ne party's breach of contract may excuse the other from performing, but it will not excuse the other from the performance due from him under a separate contract between the parties unless of course performance under the one contract is conditioned expressly on performance under the other.").  The Purchase Agreement and the Licensing Agreement are separate contracts, arising from separate transactions, executed at different points—and performance under the Purchase Agreement is not conditioned upon performance under the Licensing Agreement or vice versa [ECF No. 1 pp. 9–24; ECF No. 81-10; ECF No. 105-4].  Thus, Plaintiff's performance under the Purchase Agreement was required irrespective of any alleged breach of the Licensing Agreement by Defendants.

> **ii.     The act of depositing funds in the Court registry did not alter Plaintiff's legal obligations under the Purchase Agreement.**

The Court's Order granting Plaintiff's Motion to deposit funds was clear that it did not decide the merits of the underlying contract dispute [ECF No. 52].  Nonetheless, Plaintiff argues that its obligations under the Purchase Agreement were satisfied or stayed when it deposited the funds into the Court registry [ECF No. 96 p. 4; ECF No. 134].  Defendants argue in response that depositing funds in the Court registry has no effect on the parties' obligations under the Purchase Agreement [ECF No. 130; ECF No. 55].  The Court agrees with Defendants.

Depositing funds into a court registry pursuant to Federal Rule of Civil Procedure 67 is a procedural device "only intended to provide a place of safekeeping for disputed funds pending resolution of a legal dispute and not to provide a means of altering the contractual relationships and legal duties of each party." *Prudential Ins. Co. of America v. BMC Indus., Inc.*, 630 F. Supp. 1298, 1300 (S.D.N.Y. 1986); *see also Browning Ferris, Inc. v. Montgomery Cnty*, No. 90-3258, 1990 WL 131937, at *2 (E.D. Pa. Sept. 4, 1990).  The ministerial nature of Rule 67 is supported

by the text of the rule, which contains no suggestion of an alteration of legal rights. *See* Fed. R. Civ. P. 67.[11]  As such, Rule 67 cannot be used to circumvent the risk of breach or otherwise affect the parties' contractual relationship. *See Dinkins v. General Aniline & Film Corp.*, 214 F. Supp. 281, 283 (S.D.N.Y. 1963) ("There is nothing in the history of Rule 67 or in the decisions construing it which suggests that it was designed to afford to a defendant an opportunity to deprive a plaintiff both of the benefits of his contract and of a right of action for its breach.").

Plaintiff did not alter its obligation to pay Defendants $40,000 by May 23, 2023, when it deposited the funds into the Court registry.  The Court's Order said nothing on the underlying dispute, and depositing funds into a court registry, as a general practice, has no legal effect on existing contractual relationships.  Plaintiff does not dispute its duty to pay the $40,000 under the Purchase Agreement, and it does not dispute the validity of White-Pownall assignment.  Nor has Plaintiff identified any authority to support the use of Rule 67 as a means to alter rights or obligations under a contract, relying instead on the general notion that a court possesses equitable authority to maintain the "status quo" [*see* ECF Nos. 46, 130].  The relevant "status quo" under the Purchase Agreement was that Plaintiff had to pay Pownall $40,000 by May 23, 2023, and nothing in the Court's Order altered that status quo.  Defendants therefore stand in the shoes of

---

[11] The full text of the Rule provides as follows:

  (a) Depositing Property. If any part of the relief sought is a money judgment or the disposition of a sum of money or some other deliverable thing, a party--on notice to every other party and by leave of court--may deposit with the court all or part of the money or thing, whether or not that party claims any of it. The depositing party must deliver to the clerk a copy of the order permitting deposit.

  (b) Investing and Withdrawing Funds. Money paid into court under this rule must be deposited and withdrawn in accordance with 28 U.S.C. §§ 2041 and 2042 and any like statute. The money must be deposited in an interest-bearing account or invested in a court-approved, interest-bearing instrument.

Fed. R. Civ. P. 67.

White as assignees, and there is no dispute that Plaintiff did not make the payment necessary under the Purchase Agreement to maintain its ownership interest in the Rhino molds. Accordingly, per the terms of the Purchase Agreement, upon Plaintiff's failure to pay the required $40,000, Plaintiff's ownership interest in the Rhino molds reverted back to Defendants as White's assignees.

### B.     Conclusion: Rhino molds

Without any genuine dispute that Plaintiff cannot sue to enforce its rights acquired under the Purchase Agreement, Plaintiff's Motion is **DENIED** on the issue of ownership of the Rhino molds, and Defendants' cross-motion is **GRANTED** with respect to all claims predicated on ownership of the Rhino molds. This includes Plaintiff's conversion claim as relates to the Rhino molds (Count II). It also includes Defendants' claim for a declaration that they are the legal owner of the Rhino molds (Count VI) under the Purchase Agreement and Bill of Sale [ECF No. 105-4; ECF No. 81-10].

### III.    There is a genuine issue of material fact as to whether Plaintiff forged Pownall's signature on the Licensing Agreement for purposes of Defendants' forgery counterclaim.

Plaintiff moves for summary judgment on Defendants' forgery counterclaim and affirmative defense [ECF No. 102 pp. 5–7; ECF No. 117 pp. 2–3]. As noted previously, Defendants bring a counterclaim for forgery against Plaintiff, arguing that Plaintiff is independently liable for falsifying Defendants' signatures on the Licensing Agreement [ECF No. 70]. *See supra* n.2. Pownall's signatures, or at least what appear to be Pownall's signatures, are affixed to the Licensing Agreement [ECF No. 1 pp. 22–23]. Pownall signed the Licensing Agreement in his individual capacity and as representative of Prestige [ECF No. 1 pp. 22–23]. Plaintiff argues that Pownall's signatures are clearly authentic [ECF No. 102 pp. 5–7; ECF No. 117 pp. 2–3], whereas Defendants point to irregularities with Pownall's signatures as contrary

evidence [ECF No. 112 pp. 6–7].  The Court determines that issues of fact preclude the grant of summary judgment on Defendants' forgery counterclaim.

Florida law recognizes a civil cause of action for forgery.  Forgery exists "where the defendant makes a writing which falsely purports to be the writing of another, made with the intent to injure or defraud any person." *Jamnadas v. Singh*, 731 So. 2d. 69, 71 (Fla. Dist. App. Ct. 1999). The writing in question must be of some legal efficacy, *id.* (citing *Rushing v. State*, 684 So. 2d 856, 857 (Fla. Dist. Ct. App. 1996)), and establishing a claim of forgery is necessarily a fact-intensive inquiry.

In support of the forgery claim, Defendants point to the following record evidence: (1) Pownall testified that he did not sign the Licensing Agreement; (2) Plaintiff has a general practice of requiring parties to initial each page of a contract, which was not done here; and (3) Pownall's signatures and printed name are written in different colored inks [ECF No. 112 pp. 6–7; ECF No. 1 pp. 22–23].   In response, Plaintiff highlights contrary evidence to support the authenticity of the signatures in question.  Plaitniff says (1) after the meeting where the Licensing Agreement was allegedly signed, Pownall texted Kalil "[t]hanks for the opportunity I know we will be successful"; (2) Kalil's daughter and son testified they witnessed Pownall sign the Licensing Agreement; (3) during Pownall's deposition, Plaintiff's counsel performed a blind signature comparison after which Pownall confirmed that his signature was the same as the one on the Licensing Agreement; and (4) the different colored inks used in the signature block are attributable to the fact that the first pen Pownall used to sign the Licensing Agreement ran out of ink [ECF No. 102 pp. 5–7; ECF No. 105-5; ECF No. 1 pp. 22–23].

The parties' competing versions of the facts as rooted in the summary judgment record preclude resolution of the forgery counterclaim at this stage.  Plaintiff and Defendants put forward contrary evidence on the question of forgery, much of which depends on the credibility of witness

testimony.  *See Allen-Sherrod v. Henry Cnty. Sch. Dist.*, 248 F. App'x 145, 147 (11th Cir. 2007) ("It is a hornbook principle that it is not proper for a district court to assess witness credibility when consider[ing] a motion for summary judgment as such determinations are reserved for the jury").  Accordingly, Plaintiff's cross-motion is **DENIED** on the issue of whether Pownall signed the Licensing Agreement.  Defendants' forgery counterclaim and affirmative defense will proceed to trial.[12]

## CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.  Defendants' Motion for Summary Judgment [ECF No. 83] is **GRANTED**.

    a.  Summary Judgment is granted in favor of Defendants' on Counts I–III of Plaintiff's Complaint.

    b.  Summary Judgment is granted in favor of Defendants on Counts III and VI of Defendants Counterclaims.

2.  Plaintiff's Motion for Summary Judgment [ECF No. 102] is **DENIED**.

3.  Counts I, II, IV, and V of Defendants' Amended Counterclaims [ECF No. 70] will **PROCEED** to trial.

4.  Counts VII and VIII of Defendants' Amended Counterclaims are pleaded in the alternative of Count VI [ECF No. 70].  Because the Court has granted summary judgment in favor of Defendants on Count VI and declared Defendants the legal owner of the Rhino molds, it appears there is no reason for additional legal resolution of Counts VII and VIII of Defendants' Amended Counterclaims.  Should the Court be

---

[12] The Court's grant of summary judgment in favor of Defendants as to Plaintiff's non-ownership of the Barracuda molds does not bar independent liability as to Plaintiff for the alleged forgery of signatures on a document with legal efficacy.

CASE NO. 22-14429-CIV-CANNON/McCabe

mistaken on that point, however, Defendants shall so notify the Court via written filing no later than **September 20, 2024**.

5. On or before **September 20, 2024**, Defendants shall file a status report indicating their intent to proceed with respect to the remaining counterclaims.  **The pending Motions to Withdraw as Counsel do not obviate this requirement [ECF Nos. 131, 133], and defense counsel remains counsel of record pending further Court order**.

6. Any motion for entry of partial final judgment filed by any party is due on or before **October 4, 2024**.  *See* Fed. R. Civ. P. 54(b).

7. The Clerk is directed to temporarily stay the deadlines for calendar call and trial [ECF No. 122].  The deadline to submit pre-trial filings was previously temporarily stayed, and that stay remains in effect pending further Court order [ECF No. 132].

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida this 27th day of August 2024.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record